**E-FILED**
Friday, 19 October, 2007  10:20:12 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

JEROME STEVENS, SR.,               )
                                   )
            Plaintiff,             )
                                   )
    v.                             )        No. 06 CV 2107
                                   )
CAPT. LES RIGGS and SHERIFF        )
PAT HARTSHORN,                     )        Judge Harold A. Baker
                                   )        Magistrate Judge David G. Bernthal
            Defendants.            )

### RULE 56.1 STATEMENT OF UNCONTESTED MATERIAL FACTS
### IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1.    Plaintiff Jerome Stevens, Sr. was an inmate at the Vermilion County Jail (the "Jail") from October 13, 2005, until March 23, 2006 (Stevens Dep., p. 30, attached hereto as Exhibit A; Riggs Aff., ¶¶ 3-4, attached hereto as Exhibit B).

2.    Defendant Patrick Hartshorn is the duly-elected Sheriff of Vermilion County.

3.    Defendant Les Riggs is a Captain with the Vermilion County Sheriff's Department (Ex. B, Riggs Aff., ¶ 1).

4.    Stevens was first diagnosed with asthma in 2002 at Mount Sinai Hospital during a hospitalization after he was shot in the neck, stomach and lower back (Ex. A, Stevens Dep., pp. 23, 38).

5.    When Stevens entered the Jail, he was taking two medications for his asthma condition – Albuterol and Aerobid (Id. p. 31).

6.    Stevens was using the Aerobid inhaler twice a day to prevent asthma symptoms and the Albuterol inhaler during an asthma attack (Id. p. 35).

7.      Stevens was able to keep both the Aerobid and Albuterol inhalers with him in his cell at the Jail (Id. p. 42).

8.      Inmates at the Jail are instructed at orientation to make requests, including those for medical treatment, in writing on forms provided by the administration.  Inmates do occasionally make medical requests on plain paper, but there is no guarantee that such requests make it to the proper individual or department (Galloway Aff., ¶ 3, attached hereto as Exhibit C; Ex. A, Stevens Dep., p. 37).

9.      Stevens ran out of the medicine in his Aerobid inhaler in late October 2005, and requested a new Aerobid inhaler on October 29, 2005 (Ex. A, Stevens Dep., pp. 35-36).

10.     The Jail has no record of Stevens' October 29, 2005, medical request for a new Aerobid inhaler (Ex. C, Galloway Aff., ¶ 4).

11.     Nurse Lynn Galloway is the Director of Nursing at the Jail (Id. ¶ 1).

12.     The first medical request Nurse Galloway received from Stevens was the one he wrote on November 10, 2005 (Id. ¶ 5).

13.     In the November 10 request, Stevens stated that he had an Albuterol inhaler but that he needed a new Aerobid inhaler.  He stated that he had never paid for his medication before because he had a public aid card and that his wife was going to send a valid public aid card in the mail (Id.; Ex. A, Stevens Dep., pp. 45-46).

14.     The Jail does not stock Aerobid inhalers.  They are very expensive and, since the majority of the inmates who are asthmatic do not use Aerobid inhalers, they would have to be thrown away after a period of time (Ex. C, Galloway Aff., ¶ 6).

2

15.     The Jail does stock Albuterol inhalers and an inmate will be provided with a new inhaler when the old inhaler is out of medicine and he requests a new one (Id.).

16.     The public aid card Stevens had with him at the Jail was expired; Nurse Galloway needed the card to be able to pay for a new Aerobid inhaler for Stevens (Id. ¶ 7; Ex. A, Stevens Dep., p. 60).

17.     Since Stevens had an Albuterol inhaler with him and did not submit any written requests informing Nurse Galloway that he was in an emergency situation, the nurse felt his medical condition was stable and that she could wait for his valid public aid card to order the Aerobid inhaler (Ex. C, Galloway Aff., ¶ 7).

18.     On Friday, November 18, 2005, at 6:30 p.m., Stevens submitted a medical request seeking a nebulizer treatment (Id. ¶ 8; Ex. A, Stevens Dep., p. 50).

19.     There was no medical personnel at the Jail at the time, so the request was forwarded to a Sergeant, who brought Stevens to the infirmary for a breathing treatment that was administered at 7:10 p.m. (Ex. C, Galloway Aff., ¶ 8; Ex. A, Stevens Dep., p. 52).

20.     During a nebulizer treatment, an asthmatic breathes in Albuterol through a mask that covers his nose and mouth until all of the medication is used up (Ex. A, Stevens Dep., p. 54).

21.     The fact that Stevens required a breathing treatment did not lead Nurse Galloway to believe that Stevens' asthma was an emergency situation; asthmatics occasionally require such treatments when their inhalers are not adequate during an asthma attack (Ex. C, Galloway Aff., ¶ 9; Ex. A, Stevens Dep., pp. 38-39, 55).

22.     It is not unusual for a Correctional Officer to bring an inmate for a nebulizer treatment as all asthmatics at the Jail can set up and administer the treatment (Ex. C, Galloway Aff., ¶ 9).

23.     Stevens did not make any other written requests for a nebulizer treatment while waiting for a new Aerobid inhaler (Id. ¶ 10).

24.     Stevens spoke with Nurse Galloway about his Aerobid inhaler sometime around Thanksgiving in 2005, when he came to the nurse's station for an appointment with the clinic. Nurse Galloway believed that his medical condition was still stable so she once again informed him that she needed his valid public aid card to pay for the Aerobid inhaler (Ex. A, Stevens Dep., pp. 58-59; Ex. C, Galloway Aff., ¶ 11).

25.     Stevens' wife sent to him a valid public aid card, which Stevens then provided to Nurse Galloway on Friday, December 2, 2005.  The Jail doctor, Dr. Melvin Ehrhardt, ordered a prescription for an Aerobid inhaler for Stevens on Monday, December 5, 2005, which was submitted to the pharmacy on that day (Ex. A, Stevens Dep., p. 62; Ex. C, Galloway Aff., ¶ 12).

26.     The Jail received the Aerobid inhaler on December 7, 2005, provided it to Stevens on December 8, 2005, and returned his public aid card (Ex. C, Galloway Aff., ¶ 12; Ex. A, Stevens Dep., pp. 59-60).

27.     The nursing staff at the Jail takes respiratory problems very seriously; anytime an inmate appears to be in respiratory distress, the inmate is taken immediately to the emergency room (Ex. C, Galloway Aff., ¶ 13).

28.     Stevens did not ever indicate to Nurse Galloway that he was in respiratory distress.  Nurse Galloway did not ever see Stevens in respiratory distress nor did anyone inform her that he was in respiratory distress (Id. ¶ 14).

29.     While Stevens was waiting for his Aerobid inhaler, Nurse Galloway knew that Stevens had an Albuterol inhaler with him in his cell and that when requested, he was provided with a nebulizer treatment (Id.).

30.     On January 28, 2006, Stevens submitted an inmate request form complaining of a rash on his arm and the nurse provided him with hydrocortisone cream (Id. ¶ 15).

31.     On February 18, 2006, Stevens was brought to the nurse's office for a nebulizer treatment because he felt no relief after using his Albuterol inhaler for 20 minutes.  Stevens was administered the breathing treatment (Id. ¶ 16).

32.     On February 25, 2006, Stevens submitted a medical request form to Nurse Galloway complaining of pain in his left eye and stating that another inmate said it appeared to be a blood clot.  Nurse Galloway conferred with staff from Chittick's Eye Care, who spoke with a doctor and informed her that it was most likely a broken blood vessel which would resolve itself.  The nurse monitored the situation and it did resolve itself (Id. ¶ 17).

33.     The grievance procedure at the Jail, as outlined in the Adult Orientation materials provided to inmates upon booking, provides that inmates submit all grievances or complaints regarding any incident, condition, treatment or other matter pertaining to the Jail rules and regulations, facility or staff, in writing on forms provided by jail administration and that the grievances are to be submitted to a member of the correctional staff (Ex. B, Riggs Aff., ¶ 2).

34.    Stevens was provided with the Adult Orientation materials when he was booked into the Jail on October 13, 2005 (Id. ¶ 3).

35.    Stevens did not submit to any member of the correctional staff any grievances or complaints between October 13, 2005, and March 23, 2006 (Id. ¶ 4).

36.    Stevens did not make any verbal requests, complaints or grievances to either Defendant Hartshorn or Riggs; he spoke only with Nurse Galloway about his asthma and his request for a new Aerobid inhaler (Id.; Ex. A, Stevens Dep., pp. 64-65).

Respectfully submitted,


**s/ Zrinka Rukavina**
ZRINKA RUKAVINA, Atty Bar No. 06287249
MICHAEL W. CONDON, Atty Bar No. 06192071
Attorney for Defendants
HERVAS, CONDON & BERSANI, P.C.
333 Pierce Road, Suite 195
Itasca, IL 60143-3156
Phone:  630-773-4774
Fax:  630-773-4851
zrukavina@hcbattorneys.com
mcondon@hcbattorneys.com

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| JEROME STEVENS, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06 CV 2107 |
| | ) | |
| CAPT. RIGGS and | ) | Judge Harold A. Baker |
| PAT HARTSHORN, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2007, I electronically filed the foregoing ***Rule 56.1 Statement of Uncontested Material Facts in Support of Defendants' Motion for Summary Judgment*** with the Clerk of the Court using the CM/ECF system, and I hereby certify that I have mailed by certified mail with the United States Postal Service the document to the following non CM/ECF participant:

**TO:**    Jerome Stevens, Sr.  - B30889
Sheridan Correctional Center
Inmate Mail
P.O. Box 38
Sheridan, IL 60551
***Pro Se***

by depositing a copy of same in the U.S. Mail at 333 Pierce Road, Itasca, Illinois on October 19, 2007, before 5:00 p.m., with the proper postage prepaid.

**s/ Zrinka Rukavina**
ZRINKA RUKAVINA, Atty Bar No. 06287249
MICHAEL W. CONDON, Atty Bar No. 06192071
Attorney for Defendants
HERVAS, CONDON & BERSANI, P.C.
333 Pierce Road, Suite 195
Itasca, IL 60143-3156
Phone:  630-773-4774
Fax:  630-773-4851
zrukavina@hcbattorneys.com
mcondon@hcbattorneys.com

7

2:06-cv-02107-HAB-DGB    # 43-2    Page 1 of 21

7/17/2007        Jerome Stevens, Sr. v. Capt. Riggs

E-FILED
Friday, 19 October, 2007  10:20:27 AM
Stevens
Clerk, U.S. District Court, ILCD

23

1    Q.    (Continuing) -- to Sheron?

2          After the working for the liquor

3    company and living at 47th and Cicero, where

4    did you go from there?

5    A.    Incarcerated.  What job did I have

6    after that?

7    Q.    Well, what -- in terms of what were

8    you doing with your life at that time?

9    A.    Around that time I had got shot --

10   Q.    Okay.  Tell me about that.  What

11   happened there?

12   A.    Some guys tried to rob me.

13   Q.    Where was this?

14   A.    On Cicero.  Around Cicero.

15   Q.    What year?

16   A.    Is probably 2002.  I'm not for sure

17   of the year.

18   Q.    Where were you shot?

19   A.    In my neck, my stomach, and my lower

20   back.

21   Q.    Are you fully recovered from those

22   injuries?

23   A.    Yeah, just probably still have

24   something in my lung.

ChimniakCourtReporting.com
312.781.91111

DEFENDANT'S
EXHIBIT
A

30

1          Q.    (Continuing) -- or spent time in

2     jail for?

3          A.    No.

4          Q.    Do you recall on what day you

5     entered the Vermilion County Jail?

6          A.    It was in the month of October I

7     believe.

8          Q.    Of what year?

9          A.    '05.

10          Q.    You said that was on the burglary

11    charges?

12          A.    Yes.

13          Q.    When did you leave the Vermilion

14    County Jail?

15          A.    I left in '06.  I believe March,

16    '06.  March '06.

17          Q.    And that is because you were

18    convicted of the burglary?

19          A.    Yes.

20          Q.    And then you went to Sheridan?

21          A.    Yes.

22          Q.    When you were first brought to the

23    Vermilion County Jail, were you suffering from

24    any medical conditions?

31

1        A.    No.   Well, I have asthma, so -- and

2    I had my sprays.

3        Q.    Is asthma the only medical condition

4    you were suffering at that time, suffering

5    from?

6        A.    Yes.

7        Q.    You said you were on medication.

8    Can you tell me the medication you were on?

9        A.    Albuterol and Aerobid.

10       Q.    And when you entered the jail, did

11   you have each of these medications with you?

12       A.    Yes.

13       Q.    Are you currently on any medication

14   for the asthma?

15       A.    Yes.

16       Q.    Those same two?

17       A.    Yes.

18       Q.    Are you on any other sort of

19   medication for something other than asthma?

20       A.    For depression; Celexa.  Celexa.

21       Q.    Anything else?

22       A.    No.

23       Q.    At the Vermilion County Jail, what

24   section were you housed in?  How is the

7/17/2007        Jerome Stevens, Sr. v. Capt. Riggs        Stevens

35

1  obviously what the albuterol does.  Is it an

2  inhaler, or is it a medication that you take

3  through a pill?

4      A.    The albuterol is like when you have

5  an asthma attack, and the Aerobid is like --

6  you take that twice a day to prevent asthma

7  attack.  And that's the one I ran out of.

8      Q.    Okay.  Are they both inhalers?

9      A.    Yes.

10     Q.    Now, you said earlier that you had

11  each of these when you were first brought to

12  the jail?

13     A.    Yes.

14     Q.    How soon after you were -- you came

15  to the jail did you start having a problem with

16  the asthma?

17     A.    When I ran out.

18     Q.    Okay.  And when did you run out?

19     A.    Probably it wasn't too long after I

20  came to the place, because I didn't have that

21  much in there.

22     Q.    Okay.  So sometime in October?

23  Sometime in November?

24     A.    Probably -- I don't know.  Probably

2:06-cv-02107-HAB-DGB    # 43-2    Page 5 of 21

7/17/2007        Jerome Stevens, Sr. v. Capt. Riggs        Stevens

36

1    the end of October, the beginning of November.

2        Q.    I have something here --

3        A.    The end of October.

4        Q.    Something here from November 10th of

5    2005, and you're asking for your -- for the

6    Aerobid pump.

7        A.    Mm-hmm.

8        Q.    Is this about the time when you

9    first requested it?

10       A.    No.  I requested it November the

11   29th, '05.

12       Q.    November -- October 29th, '05?

13       A.    Yes, October.  October 29th, '05.

14       Q.    Let me ask you this.  What have you

15   reviewed in preparation for this deposition?

16       A.    What do you mean?

17       Q.    For example, the piece of paper that

18   you have with you.

19       A.    This is the document that I had when

20   I was in Vermilion County.  Every time I sent a

21   request slip, what officer I gave it to, what

22   time it was, and what date it was, and what the

23   request slip said.

24       Q.    Did you keep track of that as the

37

1  days went along, or did you sit down one day

2  and write down everything you remembered?

3      A.    No, this was every day.  Every day

4  that it happened, that's when I did it.

5      Q.    Can you tell me what the procedure

6  is at Vermilion County Jail for medical

7  requests?  How does that work?

8      A.    You have to send a request slip.

9      Q.    Do you have these requests with you

10  in the day room?  Do you request the request

11  slip?

12      A.    You can request a request slip from

13  someone who is there at the jail, yeah.

14      Q.    Is there a specific form, or can

15  you -- besides the specific form you were just

16  talking about, the request slip, must you write

17  a letter, or must you use the specific form?

18      A.    Well, you have to use the specific

19  form, but sometime they say they didn't have

20  anything, you know what I mean?  So I wrote on

21  a piece of paper sometimes and handed it to the

22  officer.

23      Q.    Okay.  So you give it to an officer.

24  Do you get a copy back?

38

1  A. No.

2  Q. When were you first diagnosed with

3 asthma?

4  A. When I got shot.

5  Q. So that was about 2002?

6  A. Yeah.

7  Q. Do you recall the name of the doctor

8 who diagnosed you?

9  A. No.

10  Q. Do you recall, was it in the

11 hospital after the shooting?  Was it a private

12 doctor?

13  A. In the hospital after the shooting.

14  Q. Which hospital were you at?

15  A. Mount Sinai.

16  Q. Besides the albuterol and the

17 Aerobid, is there any other way you treat the

18 asthma?

19  A. A breathing machine.

20  Q. Do you do that every day?

21  A. No.

22  Q. When would you do that?

23  A. When my asthma gets so bad that I

24 can't breathe and the medication doesn't work.

39

1    Q.    When would that happen?

2    A.    Probably the changing of the weather

3  or something.  Probably like air conditioners,

4  because I can't sleep with air conditioners or

5  fans.

6    Q.    Does the construction work ever

7  bother the asthma to the point where you might

8  need the breathing machine?

9    A.    No, because I have a certain mask

10  that I have that is a certain mask that you

11  won't breathe in what's going on around you.

12    Q.    Okay.  How often do you use the

13  inhalers again?  Let's start with the

14  albuterol.

15    A.    Albuterol; I use that, like, if I'm

16  having an asthma attack.

17    Q.    How often, just in general, do you

18  think you might have an asthma attack?

19    A.    It all depends.  I can't really say

20  when it is.

21    Q.    Okay.  And the Aerobid?

22    A.    Twice a day.

23    Q.    You do that two times a day every

24  day?

42

1   the asthma --

2        A.     Well --

3        Q.     (Continuing) -- checkups?

4        A.     No, and I haven't did it since I've

5   been out, and I need to go down there and find

6   one.  No, not at this -- right now.

7        Q.     Have you been on the albuterol and

8   the Aerobid since 2002, when you were first

9   diagnosed?

10        A.     Yeah.

11        Q.     The albuterol inhaler, when you were

12   at Vermilion County, were you able to keep that

13   with you?

14        A.     Yes.

15        Q.     And the Aerobid, while you still had

16   it, were you able to keep that with you as

17   well?

18        A.     Yeah.

19        Q.     Generally when you run out of the

20   Aerobid, how do you get some more?  Do you have

21   to get a prescription somewhere?  Do you just

22   go to the pharmacy?  How do you get more of

23   that once you run out generally?

24        A.     Well, if I'm not on -- have a

45

1          as Exhibit 2.

2                    (Whereupon Stevens Deposition

3                     Exhibit No. 2 was marked as

4                     requested.)

5    BY MS. RUKAVINA:

6          Q.    Jerome, I'm going to show what we

7    have marked here as Exhibit No. 2.  Can you

8    tell me what this is?

9          A.    It was something that I sent to the

10   courts.

11         Q.    Originally?

12         A.    Yes.

13         Q.    Is this not something you sent to

14   the nurse on November 10, 2005?

15         A.    Yes.  Yes.

16         Q.    So this is a request you sent to the

17   nurse --

18         A.    Yes, one of them.

19         Q.    (Continuing) -- November 10, 2005?

20               And in the request you are

21   requesting the Aerobid inhaler; correct?

22         A.    Mm-hmm -- yes.  I'm sorry.

23         Q.    You state that you have a public aid

24   card; correct?

7/17/2007        Jerome Stevens, Sr. v. Capt. Riggs        Stevens

46

1    A.    Yes.

2    Q.    So as of November 10th, there was

3  talk about the public aid card?

4    A.    Yes.

5    Q.    Now, why don't we -- we'll go

6  through your complaint.

7          MS. RUKAVINA:  For the record, the

8          complaint was marked as Exhibit No. 1 in

9          the first part of the deposition on June

10          14th, 2007.  It was not discussed during

11          that portion of the deposition, but it was

12          marked, so we will leave it marked as

13          Exhibit 1 from June 14th, 2007.

14  BY MS. RUKAVINA:

15    Q.    Is this the complaint you filed in

16  this case?

17    A.    Yes.

18    Q.    On page 4, page 4 you state that you

19  sent a request to the nurse on October 29th,

20  2005; correct?

21    A.    Yes.

22    Q.    Then you mention that you sent a

23  request form to the nurse on November 10th,

24  2005; correct?

7/17/2007        Jerome Stevens, Sr. v. Capt. Riggs        Stevens

50

1  have the request form, but you sent the

2  nurse --

3      A.    No, what I'm saying is all this that

4  you have saying request form is on there, it's

5  is not the actual request forms.  This is,

6  like -- this right here (indicating) is what

7  you got out of my transcripts.

8              MS. RUKAVINA:  Can we go off the

9          record for a second?

10                  (Discussion off the record.)

11  BY MS. RUKAVINA:

12      Q.    If we could just put on the record,

13  Jerome, what you just said.  That this is, in

14  fact, the request that you did send to the

15  nurse on November 18th, 2005; correct?

16      A.    Yes.

17      Q.    And in this request you state that

18  you have asthma and you need a breathing

19  treatment; correct?

20      A.    Yes.

21      Q.    You state here that you have a

22  medical card and that you don't have to pay --

23  and you're hoping you don't have to pay for the

24  visit; correct?

52

1           Then when they put it back up there,

2   it took them so long for them to come back to

3   find out what's going on to the camera, when

4   they did they said, "Take it off there."

5           I said, "No, don't take it off.

6   Leave it up until somebody come over here."

7           Then after a while they -- Sergeant

8   Maskel (phonetic) I believe his name was, he

9   came up there, and that probably was like -- it

10  was a while when they came up there to get me.

11  And when he said, "Sorry for the" -- you know,

12  sorry for him taking so long, but he was the

13  only one that has the keys.  The nurse is not

14  there on the weekends.

15          I believe that was a weekend, that

16  date, and he just kept saying he was sorry for

17  that; went downstairs and gave me a breathing

18  treatment.

19      Q.    When you say "a while," what does

20  that mean?  In half an hour?  An hour?  Just to

21  the best of your recollection.

22      A.    More than a half an hour.  I'll say

23  that.

24      Q.    So somewhere between a half an hour

54

1    first request on November 18th, 2005, to your

2    breathing treatment was about an hour and a

3    half?

4        A.    Yes.

5        Q.    So you did, in fact, get the

6    breathing treatment that day?

7        A.    Yes.

8        Q.    What does the breathing treatment

9    consist of?

10       A.    It's, like, something that goes

11   around your nose and your mouth.

12       Q.    So like a mask?

13       A.    Yeah.  And they put albuterol in it,

14   and it helps you breathe, clears your lungs up.

15       Q.    How long would you have that mask on

16   your face?

17       A.    Until the medication is completely

18   empty that you put inside there.

19       Q.    Do you know approximately how long

20   that takes?

21       A.    Probably about 20 minutes.

22       Q.    You said they put albuterol inside

23   of it.

24       A.    Yes.

55

1    Q.    Did you have your albuterol inhaler

2  at the time?  How come you didn't -- did that

3  help you at all before --

4    A.    No, it didn't.  Sometimes, you know,

5  the pump doesn't work as well as the breathing

6  machine.

7    Q.    Okay.  So that's why you get a

8  breathing treatment rather than use the pump?

9    A.    Yes.

10    Q.    But it is the same medicine?

11    A.    Yeah.

12    Q.    After you received the breathing

13  treatment on November 18th, were you taken back

14  to your cell?

15    A.    Yes.

16    Q.    Where was the breathing treatment?

17    A.    In -- downstairs in the nurse's

18  area.

19    Q.    Okay.

20        MS. RUKAVINA:  We can mark this,

21     please, Exhibit No. 4.

22            (Whereupon Stevens Deposition

23            Exhibit No. 4 was marked as

24            requested.)

58

1      Q.    Did you tell him at that time that

2   you also had a medical card?

3      A.    No.

4      Q.    On page 6 of your complaint you

5   state (reading):

6            "A day before Thanksgiving I put a

7   request form in to the clinic.  The clinic not

8   the same as the in-house nurse."

9            Correct?

10     A.    Yes.

11     Q.    Tell me about the clinic.

12     A.    The clinic -- well, at the time I

13  didn't know there was a difference, but at this

14  time I was still trying to get my Aerobid, and

15  so I wasn't getting this through the county

16  jail.  The clinic is someone's office that

17  comes there, and, like, check on people to see

18  if they have, like, I guess diseases or

19  something like that.  But at the time I didn't

20  know.  So I was just trying to really do

21  anything I can to, you know, to get my

22  albuterol.

23            So when I went down there, when they

24  came and got me because the clinic was there --

59

1    Q.    Who runs the clinic; do you know?

2    A.    I don't know.  I don't know.  It's

3    not connected with the jail though.

4    Q.    Okay.  So it's an outside doctor,

5    hospital?

6    A.    Yeah.  The nurses come there.

7        So when I went down there, the

8    clinic said, "Well, we don't" -- "can't see you

9    because, you know, this is not our job that we

10    do as far as, you know, asthmatics and stuff."

11        So that's when they was like, you

12    know, "The nurse is right there.  You can talk

13    to her."

14        So that's when I talked to her.

15    Q.    You said this is the day before

16    Thanksgiving.

17        Okay, it next states in your

18    complaint that on December 8th, 2005, you

19    received your Aerobid pump; correct?

20    A.    Yes.

21    Q.    So on December 8th, 2005, you

22    received the Aerobid that you had requested?

23    A.    Yes.

24    Q.    It says that the officer said he

60

1    would put your public aid card back in your

2    wallet; correct?

3        A.    Yes.

4        Q.    So the public aid card was something

5    that they needed to get the Aerobid pump for

6    you?

7        A.    Yes, and also the one -- my public

8    aid card that I had had expired.  So I had

9    talked to my wife and told her to send an

10   up-to-date one.

11       Q.    Do you remember when you talked to

12   your wife about sending an up-to-date card?

13       A.    No.

14       Q.    Do you recall what date the public

15   aid card expired?

16       A.    No.

17            MS. RUKAVINA:  If we can mark this

18       as Exhibit No. 5.

19                (Whereupon Stevens Deposition

20                 Exhibit No. 5 was marked as

21                 requested.)

22   BY MS. RUKAVINA:

23       Q.    Okay, Jerome, this is Exhibit No. 5.

24   Is this the public aid card you had at the time

2:06-cv-02107-HAB-DGB    # 43-2    Page 19 of 21

7/17/2007         Jerome Stevens, Sr. v. Capt. Riggs         Stevens

62

1   prescription and put your number in and find

2   out that you do have another one that is valid.

3        Q.    But you just said that you had to

4   call your wife to get --

5        A.    That's because the jail, you know,

6   they was saying that, "Well, your card is not

7   valid."  Had they went to Walgreens or

8   wherever, they would have typed it up in the

9   computer and known that I still -- that I had

10  another one, you know, that was valid.  That my

11  wife had it.  They would have known.

12       Q.    But didn't you ask your wife to

13  bring in the new card?

14       A.    That's when I had problems with

15  them.  Vermilion County was saying, "Well, your

16  card is not valid."  That's when I told my wife

17  she had to send another one.

18       Q.    So you asked your wife to send

19  another one.  Do you recall when?

20       A.    No.

21       Q.    Did she, in fact, send another card

22  to the jail?

23       A.    Yes.

24       Q.    Do you know when she sent the card?

7/17/2007          Jerome Stevens, Sr. v. Capt. Riggs          Stevens

64

1   have against the Vermilion County Jail in this

2   federal complaint you have filed?

3        A.    Yes.

4        Q.    Who did you speak with at the jail

5   regarding the inhaler, both any- -- anybody

6   within the jail and also any cellmates or

7   anybody that you might have talked to.  For

8   example, did you speak with Captain Riggs?  Who

9   is Captain Riggs?

10       A.    You know, I believe Captain Riggs is

11  someone that's over some of the officers I

12  guess.  I don't know.

13       Q.    Did you speak with Captain Riggs

14  about the inhaler?

15       A.    I don't recall.

16       Q.    Did you have any conversations with

17  Sheriff Hartshorn about the inhaler?

18       A.    I don't recall.  As a matter of

19  fact, I don't believe I even met those people.

20       Q.    Okay.

21       A.    I think the reason why their names

22  is on that paper is because they're in charge.

23       Q.    So you spoke with Nurse Cooke?

24       A.    Yes.

65

1    Q.    Is that correct?

2    A.    Right.

3    Q.    Did you speak with anybody else

4    with -- in the nursing staff?  Did you speak

5    with anybody else other than Nurse Cooke?

6    A.    No.  She was the only one.

7    Q.    And do you recall how many times you

8    spoke with Nurse Cooke about the inhaler?

9    A.    I'm not for sure.

10    Q.    Tell me about what sorts of damages

11    you're claiming as a result of not having the

12    Aerobid inhaler from October 29th to December

13    8th.

14    A.    I had a lot of asthma attacks, and

15    if I had my pump, you know, I wouldn't have

16    even had the asthma attacks.  I, you know, I

17    wouldn't have had the asthma attacks.  So I

18    feel it was negligence on their part because,

19    for one, there is no nurse on the weekend, and

20    I believe that it should be -- in any other

21    incarceration or wherever, nurses work every

22    day.  There has to be one there.  They didn't

23    have one there.

24    And if I had it, I wouldn't have



E-FILED
Friday, 19 October 2007 09:40 AM
Clerk, U.S. District Court, ILCD

STATE OF ILLINOIS        )
                         )SS.
COUNTY OF VERMILION )

## SWORN AFFIDAVIT OF LES RIGGS

I, LES RIGGS, being first duly sworn upon oath, do state and depose that I have personal knowledge of all facts which follow and, if called, I could testify to the following:

1.    I am an officer in the Vermilion County Sheriff's Department with the rank of Captain.

2.    The grievance procedure at the Vermilion County Jail is outlined in the Adult Orientation materials provided to inmates upon booking. The procedure states that inmates shall submit all grievances or complaints regarding any incident, condition, treatment or other matter pertaining to the jail rules and regulations, facility or staff, in writing on forms provided by jail administration and that the grievances are to be submitted to a member of the correctional staff. The procedure further indicates that if a grievance is not answered to the satisfaction of the inmate, the inmate may submit a letter to the Illinois Department of Corrections Jail and Detention Standards Unit.

3.    Inmate Jerome Stevens, Sr. was provided with the Adult Orientation materials when he was booked into the jail on October 13, 2005.

4.    Mr. Stevens did not submit to any member of the correctional staff any grievances or complaints between October 13, 2005, and March 23, 2006, when he was released from the jail. Mr. Stevens never made any verbal requests, complaints or grievances to me personally.

Further affiant sayeth not.

_____
LES RIGGS

SUBSCRIBED and SWORN to before
me this 24th day of September, 2007.

_____
NOTARY PUBLIC

OFFICIAL SEAL
BRENDA B. BROWN
Notary Public, State of Illinois
My Commission Expires 05-02-11